IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT BLUEFIELD

WALTER W. GIBERSON,

    Plaintiff,

v.                                    CIVIL ACTION No. 1:21-00305

UNUM LIFE INSURANCE
COMPANY OF AMERICA,

    Defendant.


**<u>MEMORANDUM OPINION</u>**

    By Order entered September 30, 2022, the court **GRANTED** defendant's motion for summary judgment and **DENIED** plaintiff's motion for summary judgment.  The reasons for that decision follow.

**<u>Background</u>**

    On September 21, 1997, plaintiff, Walter J. Giberson, was hired by Princeton Community Hospital ("PCH") as a Security & Safety Officer.  <u>See</u> Administrative Record ("AR") 52.  PCH purchased a long-term disability plan from Unum Life Insurance Company ("Unum"), Policy No. 580366 ("the Plan" or "the Policy"), and it provided long-term disability coverage, effective January 1, 2004, to all full-time employees as defined by the Policy.  <u>See</u> AR 117, 121.  As a full-time employee of PCH, plaintiff was a participant in the long-term disability plan offered by his employer.  <u>See</u> AR 372.  The Plan is governed by the Employee Retirement Income Security Act of 1974 ("ERISA").  <u>See</u> AR 117.

On December 30, 2005, Giberson submitted a claim for long-term disability benefits to Unum.  See AR 49-67.[1]  In support of his claim, Giberson submitted an Attending Physician's Statement from his cardiologist, Dr. Naeem A. Qazi, opining that Giberson was totally disabled on July 21, 2005, by cardiac conditions (hypertension and angina) complicated by his status post kidney transplant.[2]  See AR 50-51.

Unum found that Giberson was eligible to receive long-term disability benefits under the Policy.  See AR at 372.  However,

---

[1] Of what Giberson had to provide in support of his claim for benefits, the Policy provided:

> WHAT INFORMATION IS NEEDED AS PROOF OF YOUR CLAIM?
> Your proof of claim, provided at your expense, must show:
>
> - that you are under the regular care of a physician;
> - the appropriate documentation of your monthly earnings;
> - the date your disability began;
> - the cause of your disability;
> - the extent of your disability, including restrictions and limitations preventing you from performing your regular occupations; and
> - the name and address of any hospital or institution where you received treatment, including all attending physicians.

AR 124.

[2] On June 25, 2003, plaintiff had undergone a kidney transplant.  See AR 71.

2

because the Policy contained a 180-day elimination period[3] prior to eligibility for long-term disability benefits, <u>see</u> AR 121, 134, he did not begin receiving benefits until January 18, 2006.  <u>See</u> AR 372.

The long-term disability plan at issue herein is a two-tier plan with the first tier covering the first 24 months a person receives benefits under the Plan while the second tier governs persons receiving benefits under the Plan for greater than 24 months.  <u>See</u> AR 134.  Eligibility for each tier is different.  For initial payments under the plan, a person is deemed disabled and eligible for payments if "Unum determines that: - you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and - you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury."  AR 134.  In order to continue to receive payments under the Plan after 24 months of payments, Unum must determine "that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience."  <u>Id.</u>  In addition, the Policy also requires that a claimant "be under the regular care of a physician in order to be considered disabled."  <u>Id.</u>  Obviously, the standard for demonstrating

---

[3] "Elimination Period" is defined as "a period of continuous disability which must be satisfied before you are eligible to receive benefits from Unum."  AR 155.

continued eligibility beyond 24 months is more rigorous because a person must be deemed by Unum as unable to perform the duties of <u>any</u> gainful occupation,[4] rather than just unable to perform the duties of his or her regular occupation as is required for the first 24 months.

Giberson received benefits under the Plan for the initial 24 months, <u>see</u> AR 372, and was also deemed eligible to receive benefits under the Plan beyond that time under the second tier. <u>See</u> AR 774-78.  He received benefits under the Plan for fourteen years.[5]

On January 6, 2020, Unum informed Giberson that it would be performing a review of his benefit eligibility and requested proof of his continued disability.  <u>See</u> AR 124, 1820-21.  To that end, the Policy provided:

> We may request that you send proof of continuing disability indicating that you are under the regular care of a physician.  This proof, provided at your expense, must be received within 45 days of a request by us.
>
> In some cases, you will be required to give Unum authorization to obtain additional medical information and to provide non-medical information as part of your

---

[4] "Gainful Occupation" is defined as "an occupation that is or can be expected to provide you with an income at least equal to your gross disability payment within 12 months of your return to work."  AR 155.

[5] During that period, Giberson's LTD benefit was terminated twice, but on both occasions the decision to terminate benefits was reversed on appeal.  <u>See</u> AR 512, 714, 719, 1600, 1723, 1726.

> proof of claim, or proof of continuing disability.  Unum
> will deny your claim, or stop sending you payments, if
> the appropriate information is not submitted.

AR 124.

Giberson's disability update form was provided to Unum on February 10, 2020.  See AR 1828-31.  Giberson reported that he was under the care of three medical providers:  1) Dr. Parrish (internal medicine); 2) Dr. Sekkarie (nephrology); and 3) Dr. Africa (general surgery, kidney transplant).  See AR 1829.  He further reported that he had received a cardiac work-up at Princeton Community Hospital in August 2019.  See id.  Giberson stated that he was able to care for himself without assistance and perform day-to-day activities, including light housework, laundry, email, watching television, reading, cooking, and visiting his mother 2 to 3 times a week.  See AR 1828.

On April 23, 2020, Giberson informed Unum that Dr. Parrish had given him a referral for a functional capacity evaluation ("FCE"), but he was having difficulty finding someone to perform it because of his insurance.  See AR 2064.  He also reported that he was currently suffering from rheumatoid arthritis in both hands and his lower back, making it difficult to even open a bottle of water or stand straight for more than 5-6 minutes.  See id. Giberson mentioned having a cardiac workup because of chest pains and shortness of breath while walking through the house.  See id. Of his kidney function, Giberson reported that it "has started

5

going down," "[c]reatinine [is] running higher than they want," and "[he's] thinking 45 or 50% kidney function is all I got." Id.

On May 19, 2020, Unum contacted plaintiff to see if a FCE was pending. See AR 2106-07. Giberson stated that he had not scheduled a FCE because it was not covered by his insurance. See id. When asked why his recent medical records did not reflect treatment for rheumatoid arthritis, Giberson told Unum that most medication cannot be prescribed because of his kidney transplant. See id. He reported that he walked on the treadmill every other day and had stopped a different exercise program when his creatinine levels increased. See id. He shared his fear that his transplanted kidney was declining/wearing out, that he was having difficulty sleeping, and that he may have undiagnosed sleep apnea. See id. Unum reminded Giberson to provide all information and/or evidence he wanted considered during his claim review. See id.

Unum gathered and reviewed medical records from each of Giberson's physicians. See AR 2003-42, 2045-62, 2066-76. Unum also requested of each provider information related to Giberson's functional capacity.

Dr. Parrish did not offer an opinion on plaintiff's functional capacity. See AR 2009. Unum's records revealed that Dr. Parrish did not do so because he believed doing so would require an FCE and Dr. Parrish did not do those. See id. Dr. Parrish saw Giberson six times between February 2019 and February

2020.  <u>See</u> AR 2049-61.  On April 9, 2019, Giberson was seen for a routine follow-up with no complaints, "said he feels fine" and reported "taking and tolerating medications well without noted difficulty or side effects."  AR 2059.  Dr. Parrish identified hypertension, hyperlipidemia, rheumatoid arthritis, gout, chronic kidney disease, and recurrent cold sores as the conditions being monitored.  <u>See</u> AR 2059-61.  Dr. Parrish also reported that Giberson's chronic illnesses were "stable."  AR 2059.

On May 24, 2019, Giberson was seen by Nurse Practitioner ("NP") Beverly Whitt complaining of chest congestion and cough and was diagnosed with headache syndrome and sinusitis.  <u>See</u> AR 2056-58.  On that visit, the medical records show that a chest and lung cardiovascular exam were "normal."  AR 2057-58.

On August 12, 2019, Giberson was again seen by NP Whitt and diagnosed with sciatica and gastroesophageal reflux disease.  <u>See</u> AR 2055.  The medical records from that visit once again showed that the chest and lungs and cardiovascular examination were "normal."  AR 2054-55.

Two weeks later, on August 26, 2019, Dr. Parrish saw Giberson for complaints of chest pain/pressure after "bench pressing more." AR 2053.  According to Giberson's self-report, the onset of the pain was "sudden" and "worsening."  <u>Id.</u>

On October 9, 2019, Giberson was seen for a routine follow-up with no complaints.  <u>See</u> AR 2052.  Dr. Parrish further noted that

plaintiff's chronic illnesses were "stable" and that Giberson reported "taking and tolerating medications well without noted difficulty or side effects."  Id.

On February 11, 2020, NP Whitt saw plaintiff for a sore throat, congestion, and cough, and diagnosed him with an acute upper respiratory infection.  See AR 2049-51.  On that visit, it was noted that Giberson's heart rhythm was "regular" and his heart sounds were "normal."  AR 2051.

Dr. Sekkarie's records indicated that Giberson had been seen by him on October 15, 2019, for routine follow-up monitoring of his kidney transplant status, and related hypertension and hyperarathyroidism conditions.  See AR 1942.  According to Dr. Sekkarie's records:  "There have been no medication changes. Since the last visit the patient denies problems with chest pain, edema, nausea, vomiting, urinary symptoms, fever, at this time." Id.  Dr. Sekkarie concluded that Giberson's hypertension and hyperparathyroidism were stable, although his kidney function had worsened.  See AR 1943.  Nevertheless, Dr. Sekkarie continued Giberson on all the same medications and wrote that he should return for a follow-up in twelve months.  See id.

On behalf of Dr. Africa, a nurse named Melissa F. at the Charleston Area Medical Center's Renal Transplant department, wrote of Giberson's medical condition that "from transplant standpoint patient is stable."  AR 1965.  That same letter also

stated that the transplant clinic did not complete disability forms.  See id.  Unum received a record of an office visit from Dr. Africa's office dated June 29, 2019, an annual follow-up on Giberson's transplant monitoring.  See AR 1971-74.  It appears that Giberson was examined on that date by Nurse Practitioner Lorie D. Lipscomb.  See id.  Of that encounter, NP Lipscomb wrote:

> Patient's creatinine is 2.3 today over the past couple years the patient's baseline has increased to 1.82.2 range.  Historically the patient ran a baseline of 1-1.3-1.5 the patient underwent kidney biopsy in 2016 which was negative for rejection showed acute tubular injury.  States he has been lifting weights and working our recently. . . .
>
> The patient reports he's had no issues in the last year no admission the only issue he has had was a Upper respiratory infection. . . .  He reports chronic shortness of breath which has been evaluated and the patient was told that they thought he had underlying asthma which she [sic] states he had as a child.
>
>        * * *
>
> creatinine 2.3 slightly above his baseline patient reports he has been lifting weights to build muscle mass. . . .

Id.

Unum reached out to Dr. Qazi, who had previously opined that Giberson was disabled.  See AR 1838-40.  The statement received from Dr. Qazi, dated February 27, 2020, indicated that he was unaware of any recent medical procedures or hospitalization, described Giberson's treatment plan as "conservative management," and stated that he was otherwise unable to opine on Giberson's functional capacity or any physical restrictions from a cardiac

9

perspective because he had not seen Giberson since December 11, 2018.  See id.

Plaintiff was seen by Dr. Qazi on March 3, 2020.  See AR 1928-37.  Dr. Qazi's records indicated that Giberson was seen for a routine follow-up and to discuss a stress test taken in September 2019.  See AR 1929.  The results of the stress test were not produced.  See AR 1928-37.  Dr. Qazi noted that Giberson "state[d] he is doing well, no new concerns."  AR 1929.  Dr. Qazi further reported that Giberson "has been doing okay denies any chest pains or dyspnea."  AR 1937.  Unum followed up with Dr. Qazi to see if he had an opinion on Giberson's functional capacity, having seen him on March 3.  Dr. Qazi responded on March 31, 2020, indicating that he did not believe Giberson could lift, carry, push or pull and that he was not able to perform the listed occupational demands on a full-time basis.  See AR 2014-15.  On May 20, 2020, a medical consultant for Unum, Dr. Wendy Weinstein, contacted Dr. Qazi's office to discuss the missing stress test. See AR 2124.  Dr. Weinstein was informed that the test was unremarkable with no ischemia identified.  See id.

On April 30, 2020, Megan M. Yeaton, RN, BSN, undertook an internal clinical review and analysis of Giberson's file on behalf of Unum.  See AR 2100-05.  Ms. Yeaton concluded that based on the record, she was unable to identify evidence that Giberson could not perform sedentary work.  See AR 2105.  Specifically, Yeaton

10

noted that Giberson's nephrology records showed "no acute cellular rejection" and that he had "not been hospitalized or shown concerns for organ rejection."  AR 2104.  Nurse Yeaton noted a "slow, gradual increase in BUN and baseline creatinine" but that there had "been no changes to antirejection medications and the frequency of the treatment plan has remained unchanged."  Id. According to Yeaton, "[t]he frequency of follow up care with transplant clinic and the nephrologist is consistent with chronic, stable kidney disease."  Id.

Of Giberson's complaints regarding fatigue, Yeaton found the "medical records, specifically the review of systems, fail to capture consistent reports of fatigue to support impairment."  Id. She likewise found Giberson's complaints regarding side effects from his medications were not supported by the medical records. See id.  Finally, based on her review of Giberson's cardiology records, Yeaton could find "no support for cardiac-based" restrictions or limitations.  Id.

Dr. Weinstein also reviewed Giberson's file on behalf of Unum.  In so doing, she reached out to Dr. Qazi's office on June 3, 2020.  See AR 2121-25.  In her letter to Dr. Qazi, Dr. Weinstein wrote:

> You indicated on a Work Capacity Narrative dated 3/31/20
> that Mr. Giberson could not perform the listed sedentary
> occupational demands which include lifting, carrying,
> pushing or pulling up to 10 pounds occasionally.

> Mr. Giberson has noted activities including working out with lifting weights and bench pressing, taking short walks, driving and doing light housework.
>
> It does not appear that the clinical information which notes stable cardiac and kidney function with no physical examination abnormalities or decline in functional activites is consistent with an impairment precluding Mr. Giberson from performing the listed sedentary occupational demands on a full-time basis.

AR 2123.  Thereafter, on June 4, 2020, Dr. Qazi stated that he believed "from a cardiac standpoint" Giberson could perform the stated functions although he continued to check the "No" box.  AR 2125, 2122-23.  Dr. Weinstein concluded that she was unable to identify any evidence in the records indicating that Giberson was unable to perform sedentary work.  See AR 2127-28.

On June 8, 2020, a vocational assessment was completed by Beth S. Darman, M.Ed., NCC, CRC, LPC, Senior Vocational Rehabilitation Consultant, to assess Giberson's ability to engage in a gainful occupation based on his education, training and/or experience.  See AR 2129-32.  Upon consideration of the record evidence, Ms. Darman concluded that there were at least three sedentary job classifications she believed Giberson was capable of performing:  Dispatcher, Information Clerk, and Call Center Representative.  See AR 2130-31.  She further stated that these occupations existed in Giberson's labor market and they "are not intended to constitute a complete list of occupations the claimant can perform."  AR 2131.

12

On June 9, 2020, Unum terminated Giberson's benefits.  He was informed by phone and letter.  <u>See</u> AR 2154, AR 2138-44.  In denying Giberson's claim, Unum wrote:

**Information that Supports Our Decision**

To remain eligible for benefits you must be disabled from performing the material and substantial duties of your pre-disability occupation or alternate gainful occupations you are qualified to perform.

* * *

You went out of work on July 22, 2005, due to chest pain.  You also have history of a kidney transplant in 2003, reported rheumatoid arthritis, hypertension and COPD.

We contacted you physicians and asked them to comment on your ability to work full-time within the following occupational demands:

- Mostly sitting
- Standing or walking for brief periods of time
- Ability to make positional changes
- Exerting up to 10 pounds occasionally to lift, carry, push, or pull.
- Occasional keyboarding
- Frequent handling, fingering, feeling
- Frequent reaching at desk level

Your transplant nephrologist, Dr. Africa, responded that he does not complete disability forms; however, states you are stable from a transplant standpoint.

Your primary care physician, Dr. Parrish, referred you for a Functional Capacity Evaluation, however, you have not found a facility that will take your insurance.

Your cardiologist, Dr. [Q]azi, indicated you were unable to work and noted you were unable to do any lifting, carrying, pushing or pulling.

Your file was reviewed to determine if the information available supports you would be precluded from

13

performing the above noted demands on a full-time basis.
Our review has concluded the medical information does
not support you are impaired from performing the above
referenced occupational demands.

At the time of our last medical review of your claim
there was concern regarding possible graft versus host
disease, however, your nephrology records reflect no
acute cellular rejection rather a biopsy showed evidence
of acute tubular injury.

Your labs show gradual increase in BUN and baseline
creatinine, however, there ha[ve] been no changes to
your anti-rejection medications.  As noted, your
transplant nephrologist has indicated you are stable
from a transplant standpoint.

You report the inability to return to work due to
fatigue, immunosuppression, and rheumatoid arthritis
affecting your hands and back.  You also report getting
short of breath just walking through your house.

Through review of your records there have been no
reports to your providers of impairing fatigue or
treatment for fatigue.  Although you remain on
immunosuppressants, other than upper respiratory
infections in 2019 and February 2020, you have not
experienced repeated infections.  The records do not
document significant side effects from your medications.

It is noted you reported back and hand pain at your
visit with Dr. Africa in June 2019.  Your
musculoskeletal exam noted you had normal range of
motion and no tenderness or swelling was noted.  Records
from Dr. Parrish do not reflect any functional deficits
from rheumatoid arthritis.  Your gait and posture are
described as normal and you are able to use a computer
on a daily basis.

It is noted you have had asthma since childhood as well
as allergies and COPD.  You have not been noted to be
short of breath or have labored breathing in your
doctor's examinations.  Your room air oxygen saturation
levels are normal and your pulmonary examinations are
overall normal with the exception of 2 prior respiratory
infections.

14

Your hypertension is well controlled and your heart rate is within normal limits with regular rhythm.  A December 2018 echocardiogram showed adequate heart function.

Your treatment records reflect you were exercising including lifting weights, including bench pressing.  We discussed this and you indicated you were at one time lifting light weights, however, [you] ceased this activity as it increases your creatine.  You note now you only walk for exercise.

It was unclear why Dr. Qazi was indicating you were unable to lift, carry, push or pull up to 10 pounds given your stable cardiac function.  Our physician contacted him to clarify this further.  Upon further consideration of your stable cardiac function he has released you to work full-time within the demands noted above.

There is currently no physician supporting continued impairment and our review of the available information does not support your medical conditions would preclude you from performing the above noted demands.

Our evaluation of your claim included a review of your medical restrictions and limitations, your employment history, and your educational background.  With the assistance of our Vocational department, we have identified the following occupational options within your capacity as outlined above:

| | | | |
|---|---|---|---|
| 1. | Dispatcher | Sedentary | $16.29 |
| 2. | Information Clerk | Sedentary | $11.87 |
| 3. | Call Center Representative | Sedentary | $11.08 |

Our review has concluded you are not disabled from performing alternate gainful occupations.  Your claim has been closed effective June 10, 2020.

AR 2139-41.  Giberson was further informed of his right to appeal Unum's decision.  See AR 2143.

By letter received on June 26, 2020, Giberson appealed Unum's decision.  See AR 2158-62.  Attached to his notice of appeal was a letter from NP Lorie Lipscomb from the CAMC Renal Transplant Unit,

15

excusing Giberson from work due to COVID-19 concerns.  See AR
2162.  According to Lipscomb, "it will not be safe for patients
undergoing immunosuppression possibly for the remainder of the
year."  Id.

     In response to Giberson's appeal and NP Lipscomb's letter,
Dr. Weinstein reached out to NP Lipscomb on July 14, 2020.  See AR
2184-86, 2196.  NP Lipscomb explained that her concern was that
Giberson had been out of work for a prolonged period of time and
would likely require "one-on-one interaction with a trainer" to
return to work, thereby increasing his risk of COVID-19 exposure.
AR 2196.  As a result of this conversation, Unum sent a list of
questions to Dr. Africa c/o NP Lipscomb.  See AR 2196-97.  NP
Lipscomb responded on July 27, 2020, agreeing with Unum that
Giberson's COVID-19 risk would be satisfactorily mitigated if, in
addition to a prospective employer's management of infection
control, he used personal protective equipment ("PPE") and adhered
to the advice of OSHA and the CDC.  See AR 2190-92.  NP Lipscomb
also opined that Giberson was otherwise capable of performing
sedentary work.  See id.

     On August 6, 2020, Giberson was notified that his claim had
been reconsidered in light of the COVID-19 risk identified by NP
Lipscomb, and that after consulting NP Lipscomb, Unum had decided
its decision did not need to be delayed due to COVID-19.  See AR
2203-05.  Unum informed Giberson:

An updated vocational review was completed to determine the risk of exposure in the identified occupations. Their review concluded these occupations would present low risk of coronavirus exposure with the use of personal protective equipment such as use of a face covering or mask, wearing gloves and following CDC guidelines such as washing hands and social distancing. The occupations identified are performed in an office environment and would be considered low risk for exposure.

Our physician board certified in Internal Medicine contacted Dr. Africa and Ms. Lipscomb to clarify if you are able to work within the above noted demands with the use of personal protective equipment and adherence to CDC guidelines.  They confirmed you are able to work full-time.

As such, your claim will remain closed and will be referred to our Appeals Department for further review.

AR 2204.

On August 31, 2020, Giberson submitted a note to Unum attaching a lab test result from July 12, ordered by Dr. Africa, reflecting an abnormal renal function test.  See AR 2273-75.  He also provided records from three visits at Dr. Parrish's office. On May 26, 2020, Giberson saw Dr. Parrish for "thyroid issues," complaining of difficulty sleeping and worsening arthritis, including left hip pain and pain with walking.  See AR 2284-87. Dr. Parrish recommended blood work that was not produced.  See id. On July 23, 2020, Giberson was seen by NP Whitt because he had fallen and injured his left arm.  See AR 2289-91.  NP Whitt recommended x-rays that were not provided.  See id.  On August 26, 2020, Giberson saw Dr. Parrish for a follow-up and complained of shortness of breath, collar bone pain, and pain in his hips.  See

17

AR 2276-83.  Dr. Parrish noted that Giberson was taking and
tolerating his medications well and without noted difficulty or
side effects and that the chronic illnesses being monitored by him
were stable.  See id.  Dr. Parrish recommended bloodwork and
referred Giberson to Rheumatology, recommending that he follow up
in six months or as needed.  See id.

In connection with his appeal, Unum interviewed Giberson on
August 25, 2020.  See AR 2264-66.  During that interview, Giberson
stated (1) that his medications cause him fatigue, weakness, and
drowsiness; (2) that he has shortness of breath he believes is
caused by asthma or his kidney transplant; (3) that his blood
pressure sometimes runs high; (4) that his hands are swollen and
his right hand may be "turning to one side;" (5) that his prior
medical records referring to weight lifting/bench pressing were
taken out of context by his doctors, and refer only to his use of
"light resistance bands" and "5-8 pound dumbbells;" and (6) that
he has a compromised immune system.  He offered to have an FCE
performed.  See id.

Giberson also reported that although his kidney is
functioning, "they are keeping a closer eye on" it.  AR 2264.  He
also stated that his creatinine and BUN are starting to be
"unstable."  Id.  Giberson indicated his belief that he was pre-
diabetic and had cysts on his kidney.  See id.  Giberson
attributed his hip pain to the medications he was taking which he

18

believed eroded the hips over time.  See AR 2264-65.  He further
stated that he was able to walk in his yard and exercise with
light weights only a couple of days a week.  See id.  Giberson did
acknowledge that his doctors recommend he move as much as possible
but he is fearful of his kidney and does not want to risk it.  See
id.  He indicated that he planned to see a rheumatologist although
he had not seen one in 17 years.  See id.

     As part of Giberson's appeal, additional medical information
from Giberson's medical providers was received by Unum.  Giberson
was seen by NP Lipscomb (of Dr. Africa's office) on June 18, 2020,
who reported that Giberson had been "feeling down," depressed, or
hopeless because of "Social Security wanting him to go back to
work especially in the middle of the" COVID-19 pandemic.  AR 2269.
Giberson also told NP Lipscomb that he was "under a lot of stress"
and that he had been advised "not to return to the workforce at
this time due to too many unknown variables and the life and death
consequences of returning to work during a pandemic."  Id.
Giberson reported not taking all prescribed medications due to
cost.  See id.  His blood pressure was "slightly elevated" and
kidney function was "stable."  AR 2270.  His creatinine was 1.9.
See id.

     Dr. Qazi provided records from an appointment on September 3,
2020, where Giberson complained of shortness of breath and hip
pain.  See AR 2299-302.  Dr. Qazi noted that he advised Giberson

to walk/get some exercise.  See id.  Dr. Qazi stated that Giberson "does have multiple medical problems and is completely disabled at this time." AR 2302.  Dr. Qazi also provided the results from the September 2019 stress test discussed above, the results of which were unremarkable.  See AR 2312-13.

Unum obtained records from Dr. Syed Ahmad, the rheumatologist Giberson saw on September 22 and 30, 2020.  See AR 2335-45.  On September 22, 2020, Dr. Ahmad diagnosed Giberson with rheumatoid arthritis with negative rheumatoid factor and generalized hypertrophic osteoarthritis.  See AR 2341.  Dr. Ahmad recommended using heat, rubs, and analgesic creams and encouraged Giberson to undertake a low-impact exercise program.  See AR 2344.  Dr. Ahmad did not make any changes to Giberson's medications.  See id.

On September 30, 2020, Dr. Ahmad reviewed Giberson's x-rays with him.  See AR 2335-39.  According to Dr. Ahmad, the x-rays showed the following:  that his right wrist showed mild degenerative osteoarthritis changes; his left wrist showed minimal narrowing of the radiocarpal joint with no evidence of osseous erosion; his pelvis and knee x-rays showed those joints to be well preserved and free of any focal tissue swelling.  See AR 2336.  Dr. Ahmad prescribed hydroxychloroquine.  See AR 2339.

On September 24, 2020, Unum obtained another vocational assessment from Kelly Marsiano, M.Ed., CRC, a Senior Vocational Rehabilitation Consultant.  See AR 2317.  Ms. Marsiano reviewed

20

Ms. Darman's vocational assessment of June 8, 2020, as well as the
new evidence produced on appeal.  See id.  Ms. Marsiano concluded
that Ms. Darman's analysis remained valid because the jobs she had
identified allowed for Giberson's ability to take breaks from
sitting, to stand or walk for brief periods of time throughout the
day, and were still gainful occupational options for Giberson.
See id.

Also on September 24, 2020, Unum obtained a supplemental
independent medical analysis of Giberson's record from Dr. Suzanne
E. Benson.  See AR 2319-27.  Dr. Benson was board certified in
Physical Medicine & Rehabilitation, Pain Medicine, and
Electrodiagnostic Medicine.  See AR 2324.  Dr. Benson concluded
that the evidence in the record, including that produced on
appeal, did not support restrictions and/or limitations that would
preclude Giberson from working in a sedentary occupation.  See AR
2322-24.  According to her, "[e]xaminations have not documented
any physical deficits that would preclude the sedentary physical
activity being considered."  AR 2323.

On October 13, Unum commissioned the services of Dane Street
to identify a cardiologist to coordinate and perform an
Independent Medical Examination ("IME") for Giberson.  See AR
2373-86.  The IME was conducted on December 3, 2020 by Dr. Roger
Seagle of Cardiology Associates of the Carolinas.  See AR 2393-97.
As to Giberson's rheumatoid arthritis, Dr. Seagle opined that

21

"[i]t does not appear that he has limitation of activity with
arthritis." AR 2396. Of Giberson's kidney disease, Dr. Seagle
acknowledged that Giberson "has chronic renal disease with a
history of renal transplantation" but that "[h]is renal function
has been stable." Id. Dr. Seagle wrote of Giberson's report that
his creatinine has increased over the last year but noted that
Giberson "is followed on an annual basis by nephrology and no
changes have been made in his regimen." Id. Dr. Seagle opined
that his renal condition "would not appear to affect his day-to-
day activity except for the risk of infection due to his
immunocompromised status and the potential of exposure to
infectious agents." Id. According to Dr. Seagle, "Mr. Giberson
would be precluded from work activity from 6/10/2020 in a public
setting due to his immunocompromised state. During the COVID-19
pandemic his risk for infection is greatly increased due to the
anti-rejection medication which he is taking. He would be able to
do sedentary work with rest breaks in an isolated setting." AR
2418.

On December 11, 2020, Unum asked Dr. Seagle to supplement his
report to additionally consider whether his opinion would be
impacted if Giberson used PPE and complied with CDC guidelines.
See AR 2409. In Dr. Seagle's report, as supplemented on December
27, 2020, he opined that Giberson was capable of sedentary work
with rest breaks in an isolated setting or, with the use of PPE

and following CDC guidelines, in a non-isolated setting.  <u>See</u> AR
2409-19.  Dr. Seagle also opined that Giberson was capable of
performing light activity that involves mostly sitting and walking
for brief periods of time if permitted to make positional changes
and frequent keyboarding as well as handling, fingering, and
feeling at desk level, with lifting, carrying, pushing, and
pulling limited to occasional and weight up to 10 pounds.  <u>See</u> AR
2413-19.

On January 8, 2021, Ms. Marsiano was asked to reconsider her
vocational assessment and opinion in light of Dr. Seagle's report.
<u>See</u> AR 2422-23.  Ms. Marsiano concluded that the vocational
options presented on June 8, 2020, Dispatcher, Information Clerk,
and Call Center Representative, remained "viable" options for
Giberson.  AR 2423.

On January 13, 2021, Unum informed Giberson that his appeal
had been denied.  <u>See</u> AR 2429-37.  In denying Giberson's appeal,
Unum wrote:

> You stopped working on July 23, 2005 due to coronary
> artery disease and underwent a cardiac catheterization
> on August 25, 2005.  Your medical records document a
> history of asthma, arthritis, renal failure and kidney
> transplant in 2003.
>
> Your Long Term Disability claim was approved on April
> 13, 2006 as the medical information supported that you
> were unable to perform the material and substantial
> duties of your regular occupation as a Security Guard.
>
> After 24 months of benefits, the Long Term Disability
> definition of disability changes.  As of January 18,
> 2008, you must be unable to perform the duties of any

23

gainful occupation for which you are reasonably fitted by education, training or experience.

* * *

It was determined that you could perform the duties of alternate gainful sedentary occupations.  You were no longer disabled under the policy and benefits were no longer payable beyond June 9, 2020.

After the claim closed, you provided a letter from Lori Lipscomb (Nurse Practitioner) noting that you were currently undergoing immunosuppression and due to COVID concerns, it was not safe for you to return to work. The file was returned to the Benefits Center for review and reconsideration.

The Benefits Center completed an updated vocational review of the alternate sedentary occupations.  They concluded that the occupations would be considered low risk with the use of personal protective equipment (PPE) and following CDC guidelines.  Examples could be the use of mask[s], wearing gloves, washing hands, and social distancing.  The alternate options are performed within an office environment and it would be reasonable [to conclude] these would be considered low risk.

The Benefits Center completed peer contact with Lori Lipscomb.  Your provider indicated that you could perform full time sedentary work (as noted above) if using the appropriate PPE and following CDC guidelines. The decision did not change and the file was returned to appeals for review.

**Appeal Decision:**

We determined the decision on your claim was correct.

**Information that Supports our Decision:**

**Vocational Consideration:**

On appeal, we completed a vocational review of the alternate sedentary occupations.  In addition to the demands noted above, the occupations allow for the ability to take breaks from sitting to stand or walk for brief periods of time throughout the day.

24

**Medical Consideration:**

On appeal, a physician board certified in Physical Medicine and Rehabilitation independently reviewed your file, including but not limited to the additional information you submitted, and gave appropriate weight to the opinion of your treating providers.  The focus of the appeal review was to determine if you continued to be disabled beyond June 9, 2020.  Our review documents the following:

The medical records in the file document that you continue to be treated by Dr. Naeem Qazi (Cardiology), Dr. Christopher Parrish (Internal Medicine), Dr. Mohammed Sekkarie (Nephrology), Dr. Syed Ahmad (Rheumatology) and the Kidney Transplant Clinic.

<u>Cardiac Condition</u>

On December 11, 2018, you underwent an echocardiogram which showed mild tricuspid regurgitation and normal left ventricular ejection fraction.

On September 3, 2019, you underwent Lexiscan Stress Test and Cardiolite Myocardial Perfusion test.  This showed no ischemia, no infarct, and normal left ventricular ejection fraction.  Testing supported functional cardiac reserve, and Dr. Qazi continued to advise walking and lifting weights through the September 3, 2020 visit.

The medical condition in the file failed to support an impairing heart condition.

<u>Rheumatoid Arthritis</u>

Rheumatoid arthritis (RA) was included in the medical records and your CCP antibody test was elevated, which is consistent with this condition.  The office visit dated August 26, 2020 with Dr. Parrish documented ulnar deviation of metacarpal joints, which is also consistent with the diagnosis.

The office visit on June 20, 2019 with the Transplant Clinic documented normal range of motion and strength with no tenderness or swelling.  There was no documentation of findings consistent with active RA.

During a telephone conversation on August 25, 2020, you indicated that you had not seen your Rheumatologist in years as you could not take medications for this condition.  You stated that you regularly take medications (Cyclosporine, Prednisone) to decrease the risk of renal transplant rejection and these medications also treat RA.

The medical records and most recent examinations in the file document normal range of motion, gait and strength. Exercise was an ongoing recommendation, which is inconsistent with inability to perform sedentary activity.

The medical records in the file do not document significant joint findings approaching June 10, 2020 (the date benefits ended) that would support active RA of a severity to preclude full time sedentary activity.

Renal Condition

While a higher Creatinine level was reported by your cardiologist on September 3, 2020, stable kidney function was noted by the Transplant Clinic on June 18, 2020.

The transplant clinic noted that you were able to perform full time sedentary work with appropriate use of PPE in a July 27, 2020 narrative.

The medical records in the file do not support that your renal condition limited you from performing full time sedentary work as of June 10, 2020.

Other Medical Conditions

The medical records dated July 23, 2020 document that you fell and hurt your left arm.  The records in the file do not support residual injury that would be expected to preclude full time sedentary activity.

You have co-morbid medical conditions of hypertension, hyperlipidemia and gout.  These conditions are not being asserted as impairing and on analysis, there is no evidence that these issues rise to a level of impairment that would warrant any restrictions or limitations.

Medication Side Effects

You reported medication side effects in your appeal
letter.  Dr. Qazi also indicated in your September 3,
2020 office visit that you had side effects from your
steroid and anti-rejection medications.

However, you denied medication side effects to Dr.
Parrish on April 9, 2019.  You also denied medication
side effects on October 9, 2019 to Nurse Practitioner
Whitt and again to Dr. Parrish on August 26, 2020.  The
office visits with Dr. Parrish documented that you were
alert and oriented with no impairment of memory,
attention or concentration.

The medical records and examinations do not support
impairing medication side effects as of June 10, 2020.

Our review concluded that the information in your claim
file does not support that you are limited from
performing full time sedentary work as referenced in the
above noted vocational reviews.  During a telephone
conversation on August 25, 2020, you requested an
Independent Medical Examination.

Independent Medical Examination (IME)

On December 3, 2020, you attended an IME with Dr. Roger
Seagle (Cardiologist).  This physician reviewed your
medical history, social history, surgical history,
medications, allergies and family history.  He completed
a physical examination.  The IME reported the following
assessment:

You have been diagnosed with RA.  You have a history of
negative rheumatoid factor as well as no evidence of
erosions or other stigmata of RA on radiographic
examination.  The only supporting evidence is an
elevated CCP antibody.  Your treatment plan is the
medications prednisone and hydroxychloroquine and your
only significant symptom is that of morning stiffness.
The IME provider noted that your physical examination
was more consistent with degenerative osteoarthritis and
you did not have activity limitation due to arthritis.

Your cardiovascular physical examination noted normal
carotid artery and jugular vein.  PMI was not displaced
and the hepatojugular reflux was absent.  Normal cardiac

rhythm and heart rate.  Normal heart sounds with no
murmur and no gallop.

You reported low back pain and neck pain.  You had full
range of motion of your cervical and lumbar spine on
physical examination.  The x-ray reports showed minimal
degenerative findings.  The IME provider noted that you
had no symptoms of degenerative disc disease.

You have been diagnosed with gout.  Your treatment plan
is the medication allopurinol.  You have not reported
any recent acute flares.

Dr. Seagle concluded that you would be able to perform
activity "which involves mostly sitting and walking for
brief periods of time if permitted to make positional
changes.  He should be able to perform frequent
keyboarding as well as handling, fingering and feeling
at desk level.  Lifting, carrying, pushing and pulling
would be limited to occasionally with weight up to 10
pounds."

Dr. Seagle also indicated that you would need rest
breaks in an isolated setting.

Independent Medical Examination Addendum

We requested an IME addendum to clarify the restrictions
of rest breaks in an isolated setting.  As noted above,
the alternate sedentary occupations would be considered
low risk with the use of personal protective equipment
(PPE) and following CDC guidelines.

Dr. Seagle opined that you would be able to perform full
time sedentary work with the use of PPE, social
distancing, wearing gloves and frequent handwashing.  He
also indicated that you would need frequent breaks of
approximately 15 minutes at two hour intervals during
the work day.

Our appeals vocational consultant further reviewed the
file based on the IME provider's findings and advised
that the alternate sedentary occupations of Dispatcher,
Information Clerk and Call Center Representative would
allow taking 15 minute breaks after two hours of work.

AR 2429-33.

It is this denial of benefits that is the subject of the Complaint filed herein.

## Summary Judgment Standard

"'When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure.'" Shupe v. Hartford Life & Accident Ins. Co., 19 F.4th 697, 706 (4th Cir. 2021) (quoting Desmond v. PNGI Charles Town Gaming, L.L.C., 630 F.3d 351, 354 (4th Cir. 2011)). Rule 56(a) of the Federal Rules of Civil Procedure provides:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

In determining whether a genuine issue of material fact exist, a court must "'view the facts and all justifiable inferences arising therefrom in the light most favorable to . . . the nonmoving party.'" Shupe, 19 F.4th at 706 (quoting Jacobs v. N.C. Admin. Office of the Courts, 780 F.3d 562, 565 n.1 (4th Cir. 2015)).

## Analysis

A. Standard of Review

In Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989), the Supreme Court held that "a denial of benefits challenged under [ERISA] is to be reviewed under a de novo

standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the Plan."  "If the plan gives the administrator or fiduciary discretionary authority to make eligibility determinations, the review is for abuse of discretion."  Shupe, 706 F.4th at 706 (citing Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 111 (2008)).

The Fourth Circuit "does not require specific phrases to trigger a particular standard of review.  Rather, we examine the terms of the plan to determine if it vests in its administrators discretion either to settle disputed eligibility questions or construe doubtful provisions of the Plan." Feder v. The Paul Revere Life Ins. Co., 228 F.3d 518, 522 (4th Cir. 2000).  A court should "find discretionary authority in the administrator if the plan's language expressly creates discretionary authority."  Id.

In the case of the long-term disability plan at issue here, the Policy provides:

You are disabled when Unum determines that:

*       you are limited from performing the material
        and substantial duties of your regular
        occupation due to your sickness or injury; and

*       you have a 20% or more loss in your indexed
        monthly earnings due to the same sickness or
        injury.

After 24 months of payments, you are disabled when Unum
determines that due to the same sickness or injury, you
are unable to perform the duties of any gainful

30

occupation for which you are reasonably fitted by
education, training or experience.

AR at 134.  The Policy also contains the following provision:

**DISCRETIONARY ACTS**

In exercising its discretionary powers under the Plan,
the Plan Administrator and any designee (which shall
include Unum as a claims fiduciary) will have the
broadest discretion permissible under ERISA and any
other applicable laws, and its decisions will
constitute final review of your claim by the Plan.
Benefits under this Plan will be paid only if the Plan
Administrator or its designee (including Unum), decides
in its discretion that the applicant is entitled to
them.

AR at 154.  The court concludes that the language cited above is

sufficient to confer discretionary authority to Unum in making

benefit determinations.  See Evans v. Eaton Corp. Long Term

Disability Plan, 514 F.3d 315, 321 (4th Cir. 2008) (finding Plan

language giving "discretionary authority to determine eligibility

for benefits" was unambiguous).

The language in the Policy notwithstanding, Giberson argues

that this court's review should be de novo because of the

operation of Maine statute 24-A M.R.S.A. § 2847-V which provides:

A group health insurance policy, contract or
certificate, including, but not limited to, a group
disability income insurance policy, contract or
certificate, may not contain a provision purporting to
reserve sole or absolute discretion to the insurer to
interpret the terms of the contract, to provide
standards of interpretation or review, to determine
eligibility for benefits, to determine the amount of
benefits or to resolve factual disputes.  An insurer
may not enforce a provision in a policy, contract or
certificate that was offered, executed, delivered or
issued for delivery in this State and has been

> continued or renewed by a group policy holder in this State that purports to reserve sole or absolute discretion to the insurer to interpret the terms of the contract, to provide standards of interpretation or review, to determine eligibility for benefits, to determine the amount of benefits or to resolve factual disputes.

Maine's statute was effective September 19, 2019.  As Unum points out, there is no indication that the statute was intended to apply retroactively.  Under Maine law, "a statute will be construed to apply prospectively unless a legislative intent to make it retroactive is clearly stated."  Salenius v. Salenius, 654 A.2d 426, 429 (Me. 1995); see also Terry v. St. Regis Paper Co., 459 A.2 1106, 1109 (Me. 1983) (noting that "the fundamental rule of statutory construction strictly followed by this Court that all statutes will be considered to have a prospective operation only, unless the legislative intent to the contrary is clearly expressed or necessarily implied from the language used") (internal citation omitted).  The Legislature is required "to express its intent to apply a statute retroactively in strong, clear and imperative language" and "a retroactive intent [will be implied only] when the statute would be inoperative other than retrospectively."  Terry, 459 A.2d at 1109 (internal quotation and citation omitted).

On its face, Maine's anti-discretionary clause statute does not apply retroactively.  Nor does it carry a necessary implication of retroactive application.  Therefore, the court

32

concludes that Maine's 2019 anti-discretion statute does not apply.  Cf. Weaver v. New England Mut. Life Ins. Co., 52 F. Supp.2d 127, 131 (D. Me. 1999) (holding that 1997 amendment to statute did not apply where "statute is unambiguous on its face and carries no necessary implication of retroactive application.").

In support of his argument that § 2847-V applies to his case, Giberson points to a recent case from California, Earle v. UNUM Life Ins. Co. of America, Case No. 15-cv-03305-EMC, 2020 WL 4434951 (C.D. Cal. July 23, 2020).  However, Earle actually cuts against Giberson's argument.  In that case, the court reviewed the denial of benefits for an abuse of discretion because "Maine allowed discretionary clauses at all times relevant to Plaintiff's claim."  Id. at 9.  In so doing, the Earle court expressly acknowledged § 2847-V but found that it did not apply. See id. at 9 n.16 ("Maine Insurance Code § 2847-V now bans discretionary clauses in group insurance policies, but the statute was not in effect during the relevant time period in this action.").

B.   Unum's Decision to Terminate Benefits

Because the Policy gives Unum discretion to determine eligibility for benefits, the court must determine whether the decision to terminate plaintiff's benefits was an abuse of discretion.  See Evans, 514 F.3d at 321; see also Booth v. Wal-

33

Mart Stores, Inc., 201 F.3d 335, 341-42 (4th Cir. 2000).  In

Evans, the appeals court provided an extensive discussion of what

"abuse of discretion" means.  See id. at 322.  As the court

explained:

> The ERISA context permits a still more
> particularized conception of the abuse of discretion
> standard.  First, in ERISA cases, the standard equates
> to reasonableness:  We will not disturb an ERISA
> administrator's discretionary decision if it is
> reasonable, and will reverse or remand if it is not.
> Firestone, 489 U.S. at 111, 109 S. Ct. 948; Booth, 201
> F.3d at 342.  Second, the abuse of discretion standard
> is less deferential to administrators than an arbitrary
> and capricious standard would be; to be unreasonable is
> not so extreme as to be irrational.  See Firestone, 489
> U.S. at 109-10, 109 S. Ct. 948; Booth, 201 F.3d at 341.
> Third, an administrator's decision is reasonable "if it
> is the result of a deliberate, principled reasoning
> process and if it is supported by substantial
> evidence."  Bernstein v. CapitalCare, Inc., 70 F.3d
> 783, 788 (4th Cir. 1995) (internal quotation omitted).
> Fourth, the decision must reflect careful attention to
> "the language of the plan," as well as the requirements
> of ERISA itself.  Booth, 201 F.3d at 342.  One adds new
> assemblages of words to this legal landscape with
> caution, but it seems on the whole that we require
> ERISA administrators' decisions to adhere both to the
> text of ERISA and the plan to which they have
> contracted; to rest on good evidence and sound
> reasoning; and to result from a fair and searching
> process.
>
> Under no formulation, however, may a court, faced
> with discretionary language . . . forget its duty of
> deference and its secondary rather than primary role in
> determining a claimant's right to benefits.  The abuse
> of discretion standard in ERISA cases protects
> important values:  the plan administrator's greater
> experience and familiarity with plan terms and
> provisions; the enhanced prospects of achieving
> consistent application of those terms and provisions
> that results; the desire of those who establish ERISA
> plans to preserve at least some role in their
> administration; and the importance of ensuring that

> funds which are not unlimited go to those who,
> according to the terms of the Plan, are truly
> deserving. . . . Thus, the language of discretion in
> an ERISA plan is a message to courts, counseling not
> judicial abdication to be sure, but a healthy measure
> of judicial restraint.

Id. at 322-23.  In determining whether a plan administrator's

exercise of discretion was reasonable, a court may consider

various factors, such as:

> (1) the language of the plan; (2) the purposes and
> goals of the plan; (3) the adequacy of the materials
> considered to make the decision and the degree to which
> they support it; (4) whether the fiduciary's
> interpretation was consistent with other provisions in
> the plan and with earlier interpretations of the plan;
> (5) whether the decisionmaking process was reasoned and
> principled; (6) whether the decision was consistent
> with the procedural and substantive requirements of
> ERISA; (7) any external standard relevant to the
> exercise of discretion; and (8) the fiduciary's motives
> and any conflict of interest it may have.

Booth, 201 F.3d at 342-43.  All eight Booth factors need not be,

and may not be, relevant in a given case.  Helton v. AT&T, Inc.,

709 F.3d 343, 357 (4th Cir. 2013).

   1.    Language of the Plan

   As to the first Booth factor, plaintiff argues that Unum's

use of Dr. Seagle to perform the IME was in violation of the the

Policy.  See ECF No. 16 at 18-19.  The Policy language governing

"Appeal Procedures" states that "[i]n a case of a claim denied on

the grounds of a medical judgment, Unum will consult with a

health professional with appropriate training and experience."

AR 152.  According to plaintiff, Dr. Seagle did not have

appropriate training and experience because he was a cardiologist.  Although he does not come right out and say it, Giberson seems to suggest that the IME had to be performed by a nephrologist.

Giberson's argument is without merit and Unum's actions with respect to the selection of a physician to perform an IME were consistent with the language of the plan.[6]  First, Giberson completely ignores that the medical opinion that he offered in support of his original claim for disability, cardiac conditions complicating kidney function, was from Dr. Qazi, a cardiologist.  And plaintiff has continued to maintain that he is disabled by cardiac conditions.  Second, plaintiff offers no reason why Dr. Qazi would be able to opine on his kidney function as it relates to his cardiac conditions but Dr. Seagle would not.  Finally, as discussed above, it is clear that Dr. Seagle considered all of plaintiff's medical conditions, including his kidney function.

   2.    *Consistency With Earlier Interpretations of the Plan*

Giberson argues that Unum's decision that he was not disabled was inconsistent with its earlier conclusions that he

---

[6] Plaintiff suggests that Unum selected Dr. Seagle to perform his IME.  See ECF No. 18 at 9 ("Dr. Seagle, the physician hired by Unum to examine the plaintiff, is a cardiologist.  Unum chose these doctors to review plaintiff's claim despite its own recognition that the plaintiff's kidney problems were the plaintiff's 'impairing physical condition' that caused him to be unable to work.").  The record shows, however, that Unum retained the services of Dane Street to select a physician to perform the IME.  In other words, Dane Street selected Dr. Seagle, not Unum.

was disabled.  In particular, he argues that Unum concluded that
he was disabled in 2016 based upon his kidney function.
According to him, his kidney function is worse now than it was
then.

When Unum reversed its decision to discontinue Giberson's
benefits in 2016, it appeared to do so primarily based upon
Giberson's "worsening renal function."  AR 1724.  Nevertheless,
Unum also noted that "it is unclear whether or not the claimant's
worsening renal function is reversible given the available
medical records, [and] follow up records should be obtained in 6
months time."  Id.  Furthermore, during the appeal process, Unum
obtained a medical opinion from Dr. Qazi noting Giberson's renal
function and other ailments and opining that he was totally
disabled at that time.  See AR 1616.

In June 2020, when the decision was made to terminate
Giberson's benefits, Dr. Qazi no longer supported that continuing
disability, see AR 2123, nor did any of his other medical
providers.  Furthermore, two medical consultants for Unum, Dr.
Weinstein and Nurse Yeaton reviewed Giberson's records and
concluded there was no evidence that would support a conclusion
that Giberson had an ongoing disability or was unable to perform
sedentary work.  See AR 2100-15, 2127-28.  During the appeal
process, Unum also obtained another medical review of Giberson's
claim, an updated vocational review, as well as an IME, all of

37

which supported Unum's decision to terminate Giberson's benefits.
See AR 2322-24, 2317, 2415-19.  Thus, Unum's 2016 decision was
not "inconsistent" because the 2020 termination decision and the
subsequent appellate decision were made with significantly more
medical evidence—the vast majority of which indicated that
plaintiff could return to work full time.  See AR 367-73, 507-20,
536-42, 659-60, 701-43, 1146-80.[7]

   3.    Conflict of Interest

   The court also finds no merit to plaintiff's argument that
Unum's conflict of interest was "substantially enhance[d]" in
this case.  ECF No. 20 at 2.  Giberson bases his argument on the
fact that Unum paid benefits to him for 14 years yet it did not
receive any premiums during this time period because the Policy
had terminated.  See id.  According to him, "[a]s the Policy had

---

          [7] The Policy requires that Giberson continue to be
disabled by the "same sickness or injury."  It appears that
during the fourteen years for which Giberson received benefits
that Unum, at times, treated his kidney function as his disabling
condition.  Therefore, if Unum were to have ignored evidence
regarding plaintiff's kidney function in making its decision to
terminate benefits, that would have been inconsistent with its
earlier position.  However, the evidence is that Unum did
consider Giberson's kidney function in making its determination.
In any event, it is the language of the Policy that should
control and an administrator is not forever bound to apply a
Policy in exactly the same way.  See, e.g. Brooks v. Hartford
Life & Accident Ins. Co., 525 F. Supp.3d 687, 703 (E.D. Va. 2021)
(determination that claimant was not disabled under the
provisions of Group Policy was consistent with the language and
past interpretations of the plan even where "defendant changed
its interpretation of plaintiff's conditions"), aff'd, 2002 WL
2800813 (4th Cir. July 18, 2022).

been terminated in September 2005, Unum was receiving no ongoing premiums from Princeton Community Hospital during the entire period that Mr. Giberson received benefits.  It is little wonder that Unum was financially motivated to cut off the plaintiff's benefits."  Id. at 2-3.

The court recognizes "that an inherent conflict can exist when a plan administrator has both the discretion to make eligibility determinations and the responsibility for paying benefits to those found eligible."  Griffin v. Hartford Life & Accident Ins. Co., 898 F.3d 371, 383 (4th Cir. 2018).  However, in this case, there is no evidence that the conflict impacted Unum's decision to terminate Giberson's benefits.  Plaintiff's assertions regarding an enhanced financial conflict are mere speculation.  He points to no evidence in the record to support his theory.  "And the structural conflict, alone, is not sufficient to render [Unum]'s entire decisionmaking process unreasonable."  Id.

4.    *Adequacy of the materials considered*

A claim administrator's decision must be supported by adequate materials and substantial evidence.  Hailey v. Verizon Commc'ns Long Term Disability Plan, No. 1:13-CV-001528-GBL, 2014 WL 5421242, at *5 (E.D. Va. Oct. 22, 2014) (citing Helton v. AT&T, Inc., 709 F.3d 343, 358-59 (4th Cir. 2013)).  Substantial

evidence is evidence that "a reasoning mind would accept as sufficient to support a particular conclusion." Id.

Importantly, plaintiff bears the burden to show that he is disabled under the terms of the policy. See Elliott v. Sara Lee Corp., 190 F.3d 601, 603 (4th Cir. 1999) ("The burden of proving the disability is on the employee."); see also AR 124 (Unum may require claimant to provide "proof of continuing disability.").

The court finds that the materials upon which Unum based its termination decision—plaintiff's medical records, an IME report, two independent physician peer review reports, and the 2020 vocational assessment (which are described in-depth above)—constitute substantial evidence.

Plaintiff argues that defendant "cherry-picked" evidence in support of its decision. See ECF No. 20 at 6 ("Unum ignored everything in the record that occurred from 2005 through 2020 and then, picked and chose evidence that it contends supports its decision to cut off plaintiff's benefits[.]"). However, as the United States Court of Appeals for the Fourth Circuit has pointed out "'picking and choosing' is just a perjorative label for 'selecting,' [and] selectivity . . . is part of an plan administrator's job." Evans, 514 F.3d at 326 (quoting Donovan v. Eaton Corp., 462 F.3d 321, 329 (4th Cir. 2006)). What is prohibited is "'wholesale disregard' of evidence in [a] claimant's favor." Id. (quoting Donovan, 462 F.3d at 329).

40

Plaintiff's assertion to the contrary, the record shows that Unum considered all the evidence and did not disregard evidence favorable to Giberson.  And "it is not an abuse of discretion for a plan fiduciary to deny disability [ ] benefits where conflicting medical reports were presented."  Elliott, 190 F.3d at 606.  Unum's "assessment of the evidence in this case was fair, and it is entitled to the deference that is the result of careful work."  Eaton, 514 F.3d at 326.

> 5.    *Whether the decisionmaking process was reasoned and principled*

The Fourth Circuit requires a plan administrator to state their reasoning in denying a claimant's claim for benefits. Gagliano v. Reliance Standard Life Ins. Co., 547 F.3d 230, 235 (4th Cir. 2008).  Importantly, the Plan Administrator must address conflicting evidence.  See White v. Eaton Corp. Short Term Disability Plan, 308 Fed. Appx. 713, 717–18 (4th Cir. 2009). In other words, for its decision to stand, Unum must also address evidence in favor of plaintiff's claim that he is totally disabled.  Unum did so.  It addressed conflicting evidence, and articulated why it found the evidence unpersuasive.

Upon its review of the record, the court finds that Unum executed a reasonable and principled decision-making process in both its original decision to terminate Giberson's LTD benefits and the subsequent decision to uphold that determination.  Rather than terminating Giberson's claim immediately for lack of

continuing objective medical support, Unum gave him multiple opportunities to substantiate his claim, and enlisted several doctors to review and opine on his functional capacity.  Further, the administrative record Unum had before it at the time it rendered its decisions supported Unum's decision to terminate Giberson's benefits.  Unum went to great pains to obtain plaintiff's medical records, sought reviews by its own consultants, paid for an IME, and considered all plaintiff's evidence.  There is no evidence in the record that the process by which Unum came to its conclusion was unprincipled or unreasonable.  "When an ERISA administrator rejects a claim to benefits on the strength of substantial evidence, careful and coherent reasoning, faithful adherence to the letter of ERISA and the language of the plan, and a fair and searching process, there can be no abuse of discretion—even if another, and arguably a better, decision-maker might have come to a different, and arguably a better, result."  Evans, 514 F.3d at 325-26.

### Conclusion

For the aforementioned reasons, the court found that Unum's decision was reasonable and granted defendant's motion for summary judgment and denied plaintiff's motion for summary judgment.

The Clerk is directed to mail copies of this Memorandum Opinion to all counsel of record.

42

It is SO ORDERED this 12th day of October, 2022.

ENTER:

David A. Faber
Senior United States District Judge